ORIGINAL

Approved: _____
Ryan B. Finkel / Alexandra N. Rothman
Assistant United States Attorneys

Before:   THE HONORABLE KATHARINE H. PARKER
          United States Magistrate Judge
          Southern District of New York

19MAG 2978

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :   **SEALED COMPLAINT**
                                  :
        - v. -                    :   Violations of
                                  :   18 U.S.C. §§ 371, 1347
ISMAEL JIMENEZ,                   :   and 2; 42 U.S.C. § 1320a-
    a/k/a "Gringo,"               :   7b(b)(2)
                                  :
            Defendant.            :   COUNTY OF OFFENSE:
                                  :   BRONX

- - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

   STEVEN KAY, being duly sworn, deposes and says that he is a Special Agent with the Department of Health and Human Services, Office of Inspector General ("HHS-OIG"), and charges as follows:

COUNT ONE
(Health Care Fraud)

   1.   From at least in or about April 2018, up to and including at least in or about February 2019, in the Southern District of New York and elsewhere, ISMAEL JIMENEZ, a/k/a "Gringo," the defendant, knowingly and willfully executed, and attempted to execute, a scheme and artifice to defraud a health care benefit program, to wit, Medicaid, and to obtain, by means of false and fraudulent pretenses, representations, and promises money and property owned by, and under the custody and control of, a health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, and aided and abetted the same, to wit, JIMENEZ did not report to health insurance plans, including Medicaid, that he paid Medicaid beneficiaries, and individuals who referred those beneficiaries, "kickbacks" to induce them to obtain medication from his pharmacy.

   (Title 18, United States Code, Sections 1347 and 2.)

remuneration (including kickbacks, bribes, and rebates), directly and indirectly, overtly and covertly, in cash and in kind, (1) to a person to induce such person to refer Medicaid beneficiaries to a person for the furnishing and arranging for the furnishing of items and services for which payment may be made in whole and in part under a Federal health care program, and (2) to Medicaid beneficiaries to induce those beneficiaries to purchase, lease, order and arrange for and recommend purchasing, leasing and ordering goods, facilities, services and items for which payment may be made in whole and in part under a Federal health care program, and aided and abetted such activity, to wit, JIMENEZ paid Medicaid beneficiaries, and individuals who referred those beneficiaries, "kickbacks" to induce them to purchase medication from his pharmacy.

(Title 42, United States Code, Section 1320a-7b(b)(2); and Title 18, United States Code, Section 2.)

<u>COUNT THREE</u>
(Conspiracy to Steal Government Housing Benefits)

3.  From at least in or about October 2015, up to and including at least in or about October 2018, in the Southern District of New York and elsewhere, ISMAEL JIMENEZ, a/k/a "Gringo," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, to violate Title 18, United States Code, Section 641.

4.  It was a part and object of the conspiracy that ISMAEL JIMENEZ, a/k/a "Gringo," the defendant, and others known and unknown, did embezzle, steal, purloin, and knowingly convert to his use and the use of another, and without authority did sell, convey and dispose of records, vouchers, money, and things of value of the United States and a department and agency thereof, to wit, the United States Department of Housing and Urban Development, which exceeded the sum of $1,000, and did receive, conceal, and retain the same with intent to convert it to his use and gain, knowing it to have been embezzled, stolen, purloined and converted, in violation of Title 18, United States Code, Section 641.

2

Overt Act

5.   In furtherance of this conspiracy, and to effect the illegal object thereof, the following overt act, among others, was committed in the Southern District of New York and elsewhere:

a.   On or about October 27, 2015, ISMAEL JIMENEZ, a/k/a "Gringo," the defendant, signed a letter falsely attesting that he no longer resided with a particular individual ("CC-1"), when, in truth and in fact, JIMENEZ continued to reside with CC-1.

(Title 18, United States Code, Section 371.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

6.   I am a Special Agent for HHS-OIG, and I have been involved in the investigation of this matter. I base this affidavit on that personal experience, as well as on my conversations with other law enforcement agents, and my examination of various reports and records. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**THE KICKBACK SCHEME**

7.   From at least in or about June 2018, up to and including at least in or about February 2019, ISMAEL JIMENEZ, a/k/a "Gringo," the defendant, perpetrated a fraudulent scheme in which he paid cash kickbacks to patients and patient-recruiters in order to induce these patients to fill prescriptions for "Atripla," a prescription drug used to treat HIV, among other drugs, at JIMENEZ's pharmacy, Mi Casa Pharmacy ("Mi Casa"), located in the Bronx, New York. The patients who JIMENEZ recruited to Mi Casa had insurance, frequently Medicaid, and used their insurance to pay for the prescriptions filled at Mi Casa. As a result of these actions, JIMENEZ defrauded health care plans, including Medicaid.

Background on Medicaid and Kickbacks

8. Based upon my training and experience, and my participation in this investigation, I have learned the following, among other things, regarding the Medicaid program:

a. Medicaid is a federal health care program that provides benefits to individuals and families who meet financial and other eligibility requirements. Medicaid is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Individuals who receive benefits under Medicaid are referred to as "beneficiaries."

b. In New York, the Medicaid program is funded both by the federal government and the State of New York. The federal government provides 50 percent of the funding necessary to pay Medicaid claims, and the State of New York provides the remaining 50 percent. In order to receive federal funding, New York's Medicaid program must be administered in compliance with rules and regulations established by the CMS.

c. Medicaid is considered a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

d. Under the Medicaid regulations, pharmacies are required to transmit information to Medicaid or its designee when beneficiaries retrieve prescriptions. In addition, pharmacies are required to maintain records concerning their patients.

e. To receive reimbursement for dispensing a prescription, a pharmacist is required to submit a claim, either electronically or in writing. The claim has to include certain information such as the prescription and patient's name. The pharmacist must also certify the prescription was dispensed in accordance with Medicaid rules, regulations and applicable law.

f. Medicaid regulations prohibit pharmacists or pharmacy employees from providing cash to beneficiaries in exchange for them obtaining their prescription from a particular pharmacy. Nor are pharmacies permitted to provide cash to

4

individuals for the purpose of referring beneficiaries to a particular pharmacy.[1]

### The Kickback Investigation

9. Based on my training and experience, I know that Atripla is a medication used to treat patients with HIV. Atripla can only be obtained at a pharmacy through a prescription written by a medical professional. Atripla retails for approximately $2,852 for a supply of 30 pills.

10. Based upon my training and experience, my participation in this investigation, my review of videos, reports and my conversations with law enforcement officers and witnesses, I have learned the following, among other things:

    a. ISMAEL JIMENEZ, a/k/a "Gringo," the defendant, owns Mi Casa, a pharmacy located in the Bronx.

    b. On or about June 20, 2018, two confidential sources ("CS-1" and "CS-2") entered Mi Casa at law enforcement direction.[2] CS-2 recorded what occurred with a covert video camera, the recording of which I have reviewed.

        i. During the visit, CS-1 and CS-2 approached an individual, later identified as JIMENEZ,[3] who was standing behind the counter. CS-1 stated, in substance and in

---

[1] Certain gifts with a nominal value, generally not exceeding $5, may be provided such as calendars, mugs or pencils. However, anything that can be resold or exchanged for cash (or cash itself) is prohibited.

[2] CS-1 and CS-2, like the other confidential sources described herein, are paid by HHS for information and to perform undercover operations. Information provided by the confidential sources in connection with this investigation has been corroborated by other means, including by video recordings.

[3] During this encounter, JIMENEZ introduced himself as "Ismael." At other times during this investigation individuals have referred to "Ismael" as "Gringo." I have identified him as "Ismael Jimenez" by comparing his appearance in the video recordings described herein to photographs in law enforcement databases as well as from documentation accessible to law enforcement that pharmacies are required to file.

part, that CS-1 was referred to this location by another individual. JIMENEZ stopped CS-1 from further speaking and, with a hand motion, requested that the three speak in the aisle rather than at the counter where there appeared to be other customers present.

          ii.    Once in the aisle, CS-1 told JIMENEZ, in substance and in part, that CS-2 had a prescription for Atripla. CS-2 then handed JIMENEZ a health insurance card, and JIMENEZ had CS-1 and CS-2 wait while he verified CS-2's eligibility. Several minutes later, JIMENEZ returned and stated, in substance and in part, that he was unable to verify the insurance card and that it might take more time to do so.

          iii.    JIMENEZ then escorted CS-1 and CS-2 to a nearby convenience store (the "Store"), where JIMENEZ accessed an ATM ("ATM-1") and provided CS-2 with approximately $100.[4] JIMENEZ recommended that CS-2 return in a few hours to pick-up the Atripla.

          c.    On or about June 22, 2018, CS-2 returned to Mi Casa and obtained a bottle of Atripla from JIMENEZ. This visit was recorded and I have viewed a copy of the recording.

          d.    On or about July 3, 2018, CS-1 and CS-3 entered Mi Casa and spoke with JIMENEZ. CS-3 recorded what occurred with a covert video camera, the recording of which I have reviewed.

          i.    At the counter, JIMENEZ handed CS-1 certain paperwork to complete, and asked for CS-3's health insurance card and prescription. JIMENEZ then asked CS-3, in substance in part, "you got straight Medicaid?" CS-1 responded that CS-3 had "Empire." JIMENEZ appeared to check whether CS-3's health insurance was active.

          ii.    JIMENEZ then motioned for CS-1 and CS-3 to follow him into the aisle. There, JIMENEZ stated, in substance and in part, that it would take a day or two to get the Atripla. JIMENEZ then gave CS-1 approximately $40.

          e.    On or about July 6, 2018, CS-3 returned to Mi Casa and obtained a bottle of Atripla from JIMENEZ. This

---

[4] JIMENEZ brought CS-1 and CS-2 to the Store even though, based on bank records I have reviewed, there appears to be an ATM machine inside of Mi Casa.

encounter was recorded, and I have viewed a copy of the recording.

   f. On or about July 30, 2018, CS-2 entered Mi Casa. This visit was recorded, and I have viewed a copy of that recording. During the visit, CS-2 obtained a bottle of Atripla from an employee ("Employee-1"). CS-2 asked if "Ismael" was available. Employee-1 stated, in substance and in part, that Ismael was not available and that Ismael handles the "business."

   g. On or about August 14, 2018, CS-1 and CS-3 returned to Mi Casa. This visit was recorded and I have viewed a copy of that recording. During the visit, JIMENEZ met CS-1 and CS-3 in the aisle and gave $80 to CS-1, and $100 to CS-2.[5]

   h. On or about September 27, 2018, law enforcement surveilled the area in and around Mi Casa. Law enforcement observed JIMENEZ exit Mi Casa, cross the street and converse with two individuals ("CC-2" and "CC-3"). JIMENEZ then went back inside Mi Casa while CC-2 entered a nearby healthcare center (the "Center"). Several minutes later, CC-2 exited the Center and entered Mi Casa. Shortly thereafter, law enforcement officers observed JIMENEZ and CC-2 enter the Store and further observed JIMENEZ use ATM-1. JIMENEZ and CC-2 then re-entered Mi Casa and appeared to speak in the aisle of Mi Casa. Several minutes later, law enforcement observed CC-2, CC-3 and a third individual exit Mi Casa, and when they exited, CC-2 appeared to have a quantity of U.S. currency in his hand.

   i. On or about March 19, 2019, CS-1 entered Mi Casa. This visit was audio recorded, and I have listened to a copy of that recording. During the visit CS-1 asked JIMENEZ, in substance and in part, whether patients who use other HIV medication such as "Genvoya" would also be paid. JIMENEZ responded, in substance and in part, that with respect to HIV medication he pays for "all of them." Later that day, CS-1 retrieved a prescription in the name of CS-2, sent to Mi Casa by law enforcement, purportedly on behalf of a patient that CS-1 referred. JIMENEZ provided CS-1 $140, which based on my involvement in this investigation, I believe that $40 was intended for CS-1 and $100 for the patient.

---

[5] Based on my involvement in this investigation and conversations with CS-2, I believe that the $100 paid to CS-2 was for the Atripla that CS-1 picked up on or about July 30, 2018.

11. Based on my participation in this investigation, my review of documents and records, and from conversations with other law enforcement officers and witnesses, I have learned the following, among other things:

  a. ATM-1 at the Store retains records of all withdrawals made from ATM-1.

  b. Based on the time that ISMAEL JIMENEZ, a/k/a "Gringo," the defendant, accessed ATM-1 on or about June 20, 2018 (see supra ¶ 10.b.iii), other law enforcement officers and I were able to associate a particular debit card with JIMENEZ ("Card-1").

  c. On or about June 20, 2018, Card-1 made five withdrawals from ATM-1, each for $201.50.[6] Between May 2018 and June 2018, Card-1 withdrew approximately $19,000 from ATM-1, through the following transactions, among others:

    i. Or about May 8, 2018, Card-1 made four withdrawals from ATM-1, each for $200.99;

    ii. On or about June 5, 2018, Card-1 made five withdrawals from ATM-1, each for $201.50 ;

    iii. On or about June 6, 2018, Card-1 made five withdrawals from ATM-1, each for $201.50; and

    iv. On or about June 19, 2018, Card-1 made three withdrawals from ATM-1, each for $201.50.

  d. In addition, during the same time period, Card-1 made withdrawals at other ATMs in the vicinity of Mi Casa, for a total of $14,656.

12. Based on my review of records available to law enforcement, I have learned that, from in or around June 2018 up through and including in or around March 2019, Medicaid and Medicare funded health insurance reimbursed Mi Casa approximately $2,913,341.65 for HIV prescriptions including Atripla and Genvoya.

---

[6] Based on my training and experience and involvement in this investigation, I believe the amount withdrawn each time was $200 with a $1.50 ATM fee.

**THE HOUSING BENEFIT SCHEME**

13. From at least in or about October 2015, up to and including at least October 2018, ISMAEL JIMENEZ, a/k/a "Gringo," the defendant, participated in a scheme to commit housing benefit fraud. As part of this scheme, JIMENEZ made false statements to the Government, representing to the United States Department of Housing and Urban Development ("HUD") that he did not live with another individual ("CC-1") at a particular address in the Bronx ("Address-1"). However, JIMENEZ later admitted to law enforcement officials that he did in fact live at Address-1 with CC-1. As a result of JIMENEZ's lies, CC-1 received an additional approximately $43,104 in federal housing benefits.

<u>Housing Benefit Regulations</u>

14. Based upon my training and experience, my participation in this investigation, and conversations with a law enforcement officer from the Office of the Inspector General of the HUD ("HUD-OIG"), I have learned the following, among other things:

   a. Under the Housing Choice Voucher Program (commonly known as the "Section 8 Program"), low-income individuals who meet certain eligibility criteria may obtain housing subsidies to live in privately-owned and managed apartment buildings.

   b. Low income individuals who meet certain eligibility requirements (a "Section 8 recipient") may be approved for rental assistance payments. These payments make up the difference between what the Section 8 recipient can afford and the total rent charged by the particular landlord. HUD funds the Section 8 Program.

   c. Applicants who are accepted as tenants in the Section 8 Program are required to submit an affidavit of income (the "AOI") on an annual basis certifying, among other things, the applicant's annual income, assets, household composition, and the income of any other household members. The AOI warns the signatory that submission of false claims is prohibited.

   d. Under the Section 8 Program, a tenant is required to live in the Section 8 apartment in order to rent it, and he or she may live in that apartment only with those individuals identified in the AOI. The number, identity, and income of the

individuals listed on the AOI are important factors in the determination of whether and to what extent a tenant's rent should be subsidized. Typically, the more income earned by the occupants of an apartment the less HUD subsidizes.

   e. The maximum household income above which a household becomes ineligible for Section 8 rental assistance payments varies based on, among other things, the number of household members.

   f. Whether a person is entitled to Section 8 rental assistance payments, and, if entitled, the amount to which that person is entitled, is based on the reported household income and composition.

### The Housing Scheme Investigation

   15. Based upon my training and experience, my participation in this investigation, my review of reports and from conversations with HUD-OIG law enforcement officers, I have learned the following, among other things:

   a. On or about November 17, 2015, CC-1, the tenant of Address-1, signed a form titled "Owner's Certification of Compliance with HUD's Tenant Eligibility and Rent Procedures" ("2015 Form"). The 2015 Form is required to be completed, signed and sent to the managing office in order for an individual to receive Section 8 housing benefits. The 2015 Form requires that the beneficiary list all individuals who reside with them. The 2015 Form stated that the only tenant living at a particular location ("Address-1") was CC-1.

   b. The 2015 Form had appended to it a letter dated on or about October 27, 2015 and signed by ISMAEL JIMENEZ, a/k/a "Gringo," the defendant ("Letter-1"). Letter-1 stated, in substance and in part, that "Ismael Martinez Jimenez, Certify the following: I reside at [Address-2]. I no longer live with [CC-1] at [Address-1]." Letter-1 appears to be notarized.

   c. On or about January 31, 2017, CC-1 signed a form titled "Owner's Certification of Compliance with HUD's Tenant Eligibility and Rent Procedures" ("2017 Form"). The 2017 Form is similar to the 2015 Form. Like the 2015 Form, the 2017 Form indicated that the only tenant living at Address-1 was CC-1.

   d. On or about October 17, 2018, HUD-OIG agents interviewed the occupant of Address-2 ("Individual-1").

Individual-1 was shown a picture of JIMENEZ and stated that Individual-1 did not recognize that person nor, when provided a name, did Individual-1 know who JIMENEZ was. On or about the same day, HUD-OIG agents interviewed the occupant of a home that is next to Address-2 (the "Neighbor"). The Neighbor did not know the name "Ismael Jimenez," nor did the Neighbor recognize JIMENEZ in a photograph that HUD-OIG agents provided.

    e. On or about October 3, 2018, CC-1 gave permission for HUD-OIG agents to enter Address-1. Inside, HUD-OIG agents found JIMENEZ, who stated to them, in substance and in part, that he lived at Address-1 and had lived there for approximately ten years. JIMENEZ further stated, in substance and in part, that he worked as a pharmacy technician.

    16. Based upon my training and experience, my participation in this investigation, my review of reports and from conversations with HUD-OIG law enforcement officers, I have learned that because ISMAEL JIMENEZ, a/k/a "Gringo," the defendant, was not listed as an occupant of Address-1 beginning in or around November 2015, CC-1 received approximately $43,104 more in Section 8 benefits than CC-1 was entitled to under the law.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of ISMAEL JIMENEZ, a/k/a "Gringo," the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.

_____
Steven Kay
Special Agent
Health and Human Services
Office of the Inspector General

Sworn to before me this
25th day of March, 2019

_____
THE HONORABLE KATHARINE H. PARKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

11